UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA                    Criminal No. 3:02CR81(JBA)


v.


PATRICK A. TRIUMPH                          NOVEMBER 30, 2004


### THE UNITED STATES' SENTENCING MEMORANDUM

I.    **Introduction**

On September 20, 2004, a jury found the defendant guilty of ten (10) counts of aiding and abetting the filing of false tax returns in violation of 26 U.S.C. §7206(2).  In addition, the jury returned special findings that the defendant was in the business of preparing or assisting in the preparation of tax returns and, with respect to Counts 5 through 8 of the Superseding Indictment, that the defendant obstructed the IRS' investigation of his conduct underlying those counts.  This Court is scheduled to sentence the defendant on December 15, 2004.

Based solely upon the jury's findings and using the November 1, 1995 Sentencing Guidelines, the Pre-Sentence Report ("PSR") calculates an adjusted offense level of 13. Taking into account a Criminal History Category III, the PSR states that defendant's guideline imprisonment range is 18-24 months.[1]  The defendant has moved to preclude the use of *any* tax loss in the guidelines calculation on the ground that the loss figure

---

[1] The United States agrees that the November 1, 1995 guidelines apply to defendant's sentencing because they were in effect as of the dates of the offenses for which defendant was convicted and are more favorable to the defendant than the guidelines currently in effect.  See U.S.S.G. §1B1.11(B)(1).

used in the PSR and the figure claimed by the United States are at variance with the indictment.  Defendant also seeks a downward departure on a litany of grounds: allegedly harsh conditions of pre-trial and pre-sentencing confinement, a gambling addiction that purportedly resulted in significantly diminished capacity at the time of the offenses, his family ties and responsibilities, his record of charitable works and contributions to the community, and that a criminal history category III overstates the seriousness of his prior record.

The United States contends that, under *United States v. Mincey*, 380 F.3d 102 (2d Cir. 2004), the sentencing guidelines still apply in this district and that the Court may determine, independent of the jury's findings, additional relevant conduct for sentencing purposes under a preponderance of the evidence standard.  Based on the factual record at trial, the total tax loss for which defendant should be sentenced is $37,002, thereby resulting in an adjusted offense level of 16.  The United States further requests that the Court exercise its discretion under U.S.S.G. §3C1.1 and depart upward an additional two levels to offense level 18 in light of the defendant's multiple acts of obstruction, including his willful failure to appear for judicial proceedings.  Finally, a criminal history category III fairly represents the defendant's prior criminal history and the facts and circumstances here do not justify the downward departure that the defendant seeks.

At an adjusted offense level 18 and criminal history category III, the defendant's guideline imprisonment range is 33-41 months and the United States recommends that the Court sentence the defendant within that range.

## II.    The Applicability of the Sentencing Guidelines

In *Blakely v. Washington*, 124 S. Ct. 2531 (2004), the Supreme Court held that sentencing enhancements imposed on the basis of judicial fact-finding under the State of Washington's sentencing guidelines scheme violated the Sixth Amendment right to a jury trial. Although the Supreme Court had previously held that "other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt," *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), *Blakely* redefined "statutory maximum" as "the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant."

Prior to *Blakely*, the Second Circuit Court of Appeals consistently held that facts upon which district courts base sentencing enhancements under the guidelines may be found by the court applying a preponderance of the evidence standard, rather than by a jury beyond a reasonable doubt. *See e.g. United States v. Thomas*, 274 F.3d 655, 664 (2d Cir. 2001), *cert. denied*, 531 U.S. 1069 (2001); *United States v. Garcia*, 240 F.3d 180, 184 (2d Cir. 2001). In *United States v. Mincey*, 2004 W.L. 1794717 (2d Cir. 2004), the Second Circuit addressed whether the prevailing law in this circuit as set forth in *Thomas* and *Garcia* should be abandoned in the wake of *Blakely*. Noting that the federal sentencing guidelines were not at issue in *Blakely* and that the Supreme Court had granted certiorari in two matters that specifically presented the issue of Blakely's impact upon the federal guidelines, the Second Circuit held that "unless and until the Supreme Court

3

rules otherwise, the law in this circuit remains as stated in *Garcia, Thomas* and other related caselaw...[and] the courts of this Circuit will continue fully to apply the guidelines." *Id.* at 106.  In light of *Mincey*, this Court must apply the sentencing guidelines in determining the defendant's sentence.  Not only should the Court consider the findings rendered by the jury in determining the applicable guideline range, but the Court should consider additional relevant conduct which it finds to have been proven by a preponderance of the evidence presented at trial or at sentencing.  *See United States v. Watts*, 519 U.S. 148, 156-157 (1997).

## III.     The Offense Conduct (including Additional Relevant Conduct) and Guideline Calculations

During 1996 and 1997, the defendant was in the business of preparing tax returns, including U.S. individual income tax returns and amended U.S. individual income tax returns, for his taxpayer clients.  The defendant prepared numerous returns in which he included fraudulent deductions and child care credits that he knew the taxpayers were not entitled to claim.  There were thirty-seven (37) returns at issue in the jury trial over which this Court presided.  In those returns, the defendant claimed fraudulent deductions primarily in the areas of charitable contributions and miscellaneous job expenses.  To the extent that  clients had certain expenses that fell into these categories, the defendant padded them.  If the client had no such expenses, the defendant created them.  With respect to child care expenditures, the defendant engaged in a similar pattern of deceit.  If his taxpayer client had such expenses, he

4

would add further expenses purportedly paid to his wife, Tots R Us, the business address of which he often listed as his residence, or to The Homework Club, a tutoring service which the defendant knew did not provide day care services. On some occasions, he created expenses even where the taxpayer (e.g. Angella/Sylvanius Downer) had no children that required such services. Finally, in some instances, defendant created fictional dependents so that he could claim certain filing status and exemptions to which the taxpayers were not entitled so as to reduce their tax liability. The taxpayers did not provide defendant with the fraudulent information; it was a product of his own imagination. Almost universally, the taxpayers' interaction with the defendant was characterized by virtually no documentation and very little discussion.

In essence, the defendant took advantage of unsuspecting and unsophisticated taxpayers by creating a false impression that he knew tax preparation techniques that their existing preparers did not. Ultimately, he parlayed this false perception into a money-making opportunity as his name was spreading throughout the community. In reality, it was pure fiction concocted by the defendant to justify charging these taxpayers hefty fees for preparation of multiple returns. Based on the testimony of the taxpayers and the contents of the returns, the defendant's scheme here was willful and deliberate.

The jury found defendant guilty beyond a reasonable doubt as to ten of these returns, and it also found that the defendant's willful inclusion of fraudulent and materially false items in these returns resulted in a tax loss of $6,121.00. However, the

tax loss resulting from the defendant's conduct should not be limited to this figure and should include the loss attributable to the defendant's inclusion of fraudulent items in the other twenty-seven returns at issue.  The jury certainly did not return a "not guilty" verdict as to these returns.  At the very least, by a preponderance of the evidence presented at trial, the defendant aided and abetted the filing of false returns set forth in those counts as to which the jury was hung.  Thus, the tax loss attributable to all thirty-seven (37) returns, $37,002.00, should be used in the defendant's guidelines calculation and accordingly, under U.S.S.G. §2T4.1, the defendant's base offense level is 12.

### 1.    The Defendant's Motion to Preclude Use of Tax Loss

The defendant argues that since the Superseding Indictment alleged a loss greater than forty thousand ($40,000) dollars, and neither the jury finding nor the loss amount favored by the government satisfies that allegation, the tax loss should be disregarded in its entirety for sentencing purposes.  First, defendant seems to presuppose the application of *Blakely* to the guidelines and that *Blakely* has transformed sentencing factors into elements of the offense.  As the sentence guidelines apply here, this argument is unavailing.  However, even assuming *Blakely* applies for the sake of argument, the sentencing factors that were alleged in the indictment are simply "factors" that can be used to enhance the defendant's maximum sentence; they do not assume the role of "elements" to the offense.  *See Coleman v. United States,* 329 F.3d 77, 84 (2d Cir. 2003) ("The holding of *Apprendi* dictates only who must decide certain

6

factual disputes and under what standard of proof they must be decided.  It does not

determine which facts are 'elements' of a crime nor refer to any substantive norms.").

Finally, the jury's finding of lesser loss amounts would be the equivalent of the jury

finding that the defendant committed a lesser included offense.  *See United States v.*

*Teslim,* 869 F.2d 316, 326 (7th Cir. 1989) (citing *United States v. Schmuck,* 489 U.S. 705,

715-17 (1989)) (holding that a conspiracy to distribute a lesser amount of drugs than

charged in the indictment must be deemed a lesser included offense because "[t]he two

crimes are exactly identical except for the amount requirement," and "[t]he elements of

the lesser offense are a word-for-word subset of the greater offense.").  Thus, even if

*Blakely* had the effect of transforming sentencing factors into elements, the jury's loss

findings would simply amount to convictions of lessor included offenses.[2]


## 2.     Additional Enhancements to Which the Defendant is Subject

Beyond a base offense level of 12, the defendant is subject to additional

enhancements based on the jury's findings.  First, since the jury concluded that the

defendant was in the business of preparing tax returns, he is subject to a 2 level

---

[2] The United States also notes that, if *Blakely* were to apply to this case, the government would have to prove specific loss amounts to a jury beyond a reasonable doubt *only if* the Court were to impose a sentence greater than the unadjusted base offense level provided by the guidelines on any given count.  *See United States v. White,* 240 F.3d 127, 135 (2d Cir. 2001). Because the Court can attain a sentence within the applicable Guidelines range by "stacking" consecutive sentences in regard to each of the counts of conviction, the Court is free to impose such a sentence here, even in the absence of *any* jury findings.  *Id.* at 135-36; *United States v. McLeod,* 251 F.3d 78, 83 (2d Cir.2001);  *United States v. Feola,* 275 F.3d 216 (2d Cir. 2001); *see also United States v. McLean,* 287 F.3d 127 (2d Cir. 2002); *United States v. Blount,* 291 F.3d 201, 213-14 (2d Cir. 2002).  However, in light of *Mincey*, the Court need not address this issue.

enhancement under U.S.S.G. §2T1.4(b)(1)(B).  Second, the jury found that the defendant

willfully attempted to obstruct the IRS' investigation of returns prepared by him by

directing Angella and Sylvanius Downer to provide materially false information to the

IRS.  The defendant created fake receipts to substantiate false child care expenses he had

included in the Downers' returns, gave the fake receipts to the Downers and instructed

them to give the receipts to the IRS when questioned about their returns.  The Downers

followed the defendant's instructions.  Under U.S.S.G. §3C1.1, the defendant is subject

to an additional 2 level enhancement as a result of this obstructive conduct.

In sum, the defendant's adjusted offense level is 16.  With a Criminal History

Category III, his guideline imprisonment range is 27-33 months.  As set forth below, the

United States requests that the Court depart upward 2 more levels under §3C1.1 based

on defendant's additional obstructive acts that were proven by a preponderance of the

evidence at trial.


IV.    **The United States' Request for Upward Departure Under U.S.S.G. §3C1.1**

U.S.S.G. §3C1.1 provides:

If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or
impede, the administration of justice during the course of the investigation,
prosecution, or sentencing of the instant offense of conviction, and (B) the
obstructive conduct related to  (i) the defendant's offense level of conviction and
any relevant conduct; or (ii) a closely related offense, increase the offense level by
**2** levels.

Application Note 3 to this section (in the 1995 Guidelines) provides that

examples of the type of conduct warranting application of this adjustment are

8

"unlawfully influencing a...witness..., directly or indirectly, or attempting to do so, producing...a false, altered or counterfeit document or record during an official investigation, and ....willfully appearing to appear, as ordered, for a judicial proceeding." The defendant's conduct here falls squarely within these examples. Here, the jury found that with respect to Counts 5 through 8, that defendant engaged in obstructive conduct by giving fake receipts to the Downers and instructing them to provide those receipts to the IRS to substantiate day care expenses that defendant included in their tax returns. In regard to this conduct, the United States concurs with the 2 level enhancement under §3C1.1 recommended in the PSR.

However, this was not the defendant's only obstructive act. Indeed, the Court has the discretion to depart upward should it find by a preponderance of the evidence that defendant engaged in further obstructive acts beyond that found by the jury. *See United States v. Ventura*, 146 F.3d 91, 97 (2d Cir. 1998)(holding that district court may depart upward under §3C1.1 beyond the ordinary 2 level enhancement if a defendant engages in multiple acts of obstruction); *United States v. Furkin*, 119 F.3d 1276, 1283-1284 (7th Cir. 1997)(upward departure for multiple and varied obstructive acts); *United States v. Black*, 78 F.3d 1, 5-6 (1st Cir. 1996)(upward departure where defendant, who already had been subject to obstruction enhancement for other conduct, attempted to hide assets to avoid restitution).

Here, in addition to the receipts he fabricated, the defendant persuaded Pekah Wallace to inform IRS investigators that The Homework Club provided day care

services when he knew that it did not.  Defendant did so in an attempt to legitimize false child care credits that he had included in several tax returns.  For the same reason, the defendant counseled Annette Shabazz to falsely advise the IRS that The Homework Club provided child care services to her.

Not only did defendant encourage witnesses to lie to protect him, but he committed another obstructive act that is wholly separate and distinct in character. On July 10, 2002, the defendant was scheduled to appear for a court proceeding, only seven (7) days before his trial date of July 17, 2002 .  Defendant knew of the scheduled appearance on July 10, 2002, knew that he was required to appear and failed to do so. As a result, the matter was continued to July 12, 2002 at which time defendant again failed to appear.  Defendant also failed to appear for trial.  Defendant's whereabouts were unknown until he was apprehended in Canada approximately ten (10) months later.  In short, defendant further obstructed justice within the meaning of §3C1.1 by wilfully failing to appear for judicial proceedings as ordered.

In light of defendant's multiple acts of obstruction during the investigation and prosecution of this matter, the Court  should exercise its discretion to depart an additional two levels under §3C1.1 beyond the ordinary 2 level enhancement.  If the Court were to apply the guidelines but decline to impose the upward departure that the Government seeks, there, in effect, would be no punishment for the defendant's failure to appear.  Indeed, taking the analysis one step further, there would be no deterrent to a defendant's repeated acts of obstruction where defendant is effectively exposed to

10

punishment only for the first act that results in the normal 2 level enhancement called

for by §3C1.1. Here, if the guidelines are applied in their entirety as required by *Mincey*,

there must be an appropriate punishment for defendant's failure to appear and his

other obstructive conduct beyond that found by the jury. Defendant should not be

given a free pass where he has directly and wilfully ignored the authority of the Court.

As such, a 2 level upward departure to account for these multiple acts is appropriate.[3]


## V. The Court Should Deny Defendant's Motions for Downward Departure

The Sentencing Guidelines provide a framework applicable to a "heartland" of

typical cases. The very reason for promulgating the Sentencing Guidelines was a

recognition of "the need to avoid unwarranted sentence disparities among defendants

with similar records who have been found guilty of similar conduct," 18 U.S.C.

§ 3553(a)(6). A sentencing court dealing with an "atypical" case has flexibility to depart

from the proscribed guidelines provided facts are present of a kind or to a degree not

contemplated by the Sentencing Commission. Although the Guidelines afford the

district court flexibility in sentencing, the power to depart should be used sparingly and

should be reserved for unusual cases. *See United States v. Williams*, 37 F.3d 82, 85 (2d

Cir. 1994; 18 U.S.C. § 3553(b) (1994); *United States v. Core*, 125 F.3d 74, 79 (2d Cir.1997).

The Second Circuit has characterized the "heartland" departure as a

---

[3] The resolution of the Government's request for an upward departure might obviate the need for a trial of Count 40 (Failure to Appear) of the Superseding Indictment.

11

"discouraged departure." *United States v. Broderson*, 67 F.3d 452, 458 (2d Cir. 1995). A court should only consider such a departure "when there are compelling considerations that take the case out of the heartland factors upon which the Guidelines rest." *United States v. Chabot*, 70 F.3d 259, 262 (2d Cir. 1995). The Supreme Court has said that the sentencing court, in resolving whether a particular case is within the heartland, "must make a refined assessment of the many facts" of the case in "comparison with the facts of other Guidelines cases," using its "day-to-day experience in criminal sentencing" to determine whether the factor in the case at hand "is present in some unusual or exceptional way." *Koon v. United States*, 518 U.S. 81, 98 (1996). The sentencing court "must impose a sentence within the applicable Guideline range, if it finds the case to be a typical one." *Id.* at 85. The defendant bears the burden of establishing that he should receive a downward departure. *See United States v. Silleg*, 311 F.3d 557, 564 (2d Cir. 2002); *United States v. Harris*, 79 F.3d 223, 233 (2d Cir. 1996).

The defendant has advanced several grounds for downward departure. It is respectfully suggested that none of the proffered grounds support the exercise of the court's discretion to depart.

### 1.  Allegedly Harsh Conditions of Pre-Trial and Pre-Sentencing Confinement

The Second Circuit has held that conditions of pre-trial confinement may be severe enough "to take a case outside the heartland of the applicable Guideline." *United States v. Carty*, 264 F.3d 191 (2d Cir. 2001). However, the cases permitting such

departures involve extreme cases of abuse and unsafe and unsanitary prison conditions. *See Carty*, 264 F.3d at 193, 196-197 (remanding for consideration of departure request where defendant was subjected to cruel prison conditions including being held in a small cell with four other inmates, with no light, no running water, and no toilet, just a hole in the ground); *United States v. Francis*, 129 F. Supp. 2d 612 (S.D.N.Y. 2001) (downward departure granted where defendant made multiple complaints to the court during pretrial detention and the extensive factual record showed abuse and mistreatment suffered by defendant in a non-federal prison); *United States v. Rodriguez*, 213 F. Supp. 2d 1298 (M.D. Ala. 2002) (downward departure justified where defendant was raped by prison guard while awaiting sentencing, expressly limiting holding to factual circumstances of case).

In this case, the defendant has spent most of his pretrial detention at Wyatt Detention Center. The defendant also spent time at New Haven Correctional Center immediately prior to and during his trials and at Corrigan after the conclusion of the most recent trial. There is no evidence that the defendant has been treated any differently than any other inmate at these facilities or that he has been the victim of physical or psychological abuse during his pre-trial detention. Moreover, the defendant fails to cite any facts to support his claim that the conditions at the Wyatt Detention Facility are in any way unduly harsh or substandard. This defendant, like the majority of federal defendants in Connecticut, has been held at the Wyatt Detention Facility, and a departure in this case would lead to a departure in virtually every federal case in this

13

district where a defendant is held prior to trial. Moreover, the defendant's pretrial detention arose as a result of his own willful failure to appear for proceedings in this matter and also, upon information and belief, because of discipline meted out to him because of his failure to obey institutional rules.

Accordingly, the defendant's pretrial conditions of detention do not take his case outside the guidelines heartland and are insufficient to warrant a downward departure from the applicable guidelines.

### 2.     Gambling Addiction/Diminished Mental Capacity

The defendant has moved for a downward departure pursuant to U.S.S.G. § 5K2.13 on the grounds that he suffers from a gambling disorder which significantly reduced his mental capacity at the time he committed the offenses of which he has been convicted. As there is no evidence to support this claim, the United States opposes the motion.

As discussed above, a district court has the discretion to depart from the applicable sentencing guideline range if it finds "an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the sentencing commission in formulating the guidelines...." U.S.S.G.§5K2.0; *see also Koon v. United States*, 518 U.S. 81, 92 (1996). Section 5K2 sets forth several areas in which the Sentencing Guideline Commission acknowledges it was "not able to take into account fully in formulating the Guidelines," thus providing a potential basis for a departure.

14

One of the areas identified is where the defendant "committed the offense while suffering from a significantly reduced mental capacity." U.S.S.G. 5K2.13. §5K2.13 provides:

> A sentence below the applicable guideline range may be warranted if the defendant committed the offense while suffering from a significantly reduced mental capacity. However, the court may not depart below the applicable guideline range if (1) the significantly reduced mental capacity was caused by the voluntary use of drugs or other intoxicants; (2) the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence; or (3) the defendant's criminal history indicates a need to incarcerate the defendant to protect the public. If a departure is warranted, the extent of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense.

Id.

An amendment to the Application Notes, effective November 1, 1998, defines "significantly reduced mental capacity" to mean a "significantly impaired ability to (A) understand the wrongfulness of the behavior compromising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful."

While the Second Circuit has yet to address the issue of whether a pathological gambling addiction may lead to a significantly reduced mental capacity within the meaning of §5K2.13, one circuit has held that it does fall within that section. *See United States v. Sadolsky,* 234 F.3d 938 (6th Cir. 2000). Furthermore, although not controlling, a district court in this Circuit similarly held that a section 5K2.13 departure may be predicated on a gambling addiction. *United States v. Liu*, 267 F. Supp. 2d 371 (E.D.N.Y. 2003)(departure granted where expert testimony established clear causal connection

between gambling addiction, inability to control behavior that defendant knew was wrongful and crime) .

In order to justify a downward departure under this section, "a defendant must establish **both** 'reduced mental capacity **and a causal link** between that reduced capacity and the commission of the charged offense.'" *United States v. Silleg,* 311 F.3d 557, 564 (2nd Cir. 2002)(emphasis added), citing *United States v. Prescott,* 290 F.2d 139, 146 (2nd Cir. 1990); *see also United States v. Piervinanzi*, 23 F.3d 670, 684 (2d Cir. 1994); *United States v. Carucci*, 33 F. Supp. 2d. 302, 303 (S.D.N.Y. 1999) (the district court rejected a request for downward departure, found no nexus between the defendant's gambling addiction and the crime of illegal stock trading and noted that... "a compulsive gambler is not, *a fortiori*, a compulsive illegal trader.") "Factual conclusions with regard to these elements are reviewable only for clear error." *Silleg*, 311 F.3d at 564.

While it appears that significantly reduced mental capacity that results from a gambling addiction may provide a basis for a downward departure if there is a causal link to the criminal conduct, the record before the Court does not support such a departure. The defendant states that he began gambling in 1996 and he continued progressively until 2002, losing approximately $100,000. PSR at ¶63. It appears that by the end of this period, he was spending $5000 per day. *Id.* While defendant may have begun gambling at around the time he prepared the returns at issue or near the commencement of the criminal investigation, it does not necessarily follow that he was

suffering from a significantly reduced mental capacity during the period of his criminal activity in this case.[4]  There is no medical documentation of any mental condition that may have stemmed from such activity at this time.  Defendant concedes that prior to his involvement in this offense, he never had a history of mental or emotional problems.  PSR at ¶67.  Furthermore, the record here is void of any causal relationship between defendant's gambling activity, any mental illness that might have resulted and the criminal conduct of which he was found guilty.[5]  In short, the defendant has failed to demonstrate, by a preponderance of the evidence, that a gambling addiction resulted in a diminished capacity that in turn impaired his ability to understand the wrongfulness of her criminal behavior, or to exercise the power of reason, or, in the alternative, to control behavior he  knew to be wrong.  Therefore, his motion for a downward departure in this regard should be denied.

### 3.    Family Ties and Responsibilities/Charitable Works and Contributions

The defendant seeks a departure based on his family ties and responsibilities and

---

[4] Records from Foxwoods indicate that between 1994 and 1996, defendant's losses totalled only $1600.00.  Mohegan Sun records indicate that he lost $130,000 between 2000 and 2002.  The government has not seen the records relied on by the Probation Office, and it may be the case that the defendant's losses were significantly greater than those reflected in the presentence report.  Indeed, records from Mohegan Sun show that the defendant purchased over $1.66 million in chips during the period 1998 through 2002.

[5] Defendant's request that he be allowed to retain a psychiatric expert in connection with this issue is untimely and should be rejected.  This request is not, as defendant has tried to suggest, subsumed within the defendant's previous request for authorization to retain an expert.  That motion, which the Court granted, sought expert services in connection with defendant's claim that he suffered from a mental defect at the time of his flight.

his contributions to his community. According to the PSR, the defendant identifies the following grounds in support of the requested departure: (1) the recent death of his son, (2) financial stress upon his family, (3) his own love and commitment to his family and (4) defendant's contributions to scholarships, sponsorship of a soccer team, and volunteer activities in his community. Other than references contained in the PSR and letters submitted on his behalf, defendant did not elaborate in further detail. The United States submits that these circumstances are not sufficiently extraordinary to warrant a downward departure.

"Family ties and responsibilities and community ties are not ordinarily relevant in determining whether a departure may be warranted." U.S.S.G. § 5H1.6.[6]   The adverse effect on a defendant's family from a defendant's imprisonment does not ordinarily warrant a downward departure, because "[d]isruption of the defendant's life, and the concomitant difficulties for those who depend on the defendant, are inherent in the punishment of incarceration." *United States v. Tejeda*, 146 F.3d 84, 87 (2d Cir. 1998) (*per curiam*), quoting *United States v. Johnson*, 964 F.2d 124, 128 (2d Cir. 1992)). "The presence of hardship resulting from imprisonment is therefore ordinarily not enough to warrant a departure. It is only 'extraordinary circumstances . . . not capable of adequate

---

[6]  Effective October 27, 2003, § 5H1.6 and its commentary were amended. The amended commentary explicitly embraces some of the limiting criteria found in the Second Circuit's pre-amendment case law, including requirements that "[t]he loss of caretaking or financial support is one for which no effective remedial or ameliorative programs reasonably are available," making the defendant's loss "irreplaceable to the defendant's family." U.S.S.G. § 5H1.6 comment. (n.1(B)(ii) & (iii)).

consideration . . . [that] may constitute proper grounds for departure.'  Only if the district court finds the hardship to be exceptional may it downwardly depart on that basis."  *United States v. Sprei*, 145 F.3d at 534; *see also United States v. Smith*, 331 F.3d 292, 294 (2d Cir. 2003)("the Guidelines disfavor departure based on family responsibilities [and] such a departure is not permitted except in extraordinary circumstances"); *United States v. Walker*, 191 F.3d 326, 338 (2d Cir. 1999)(downward departure for family circumstances "must be reserved for situations that are truly extraordinary").

The Second Circuit defers to the sentencing court regarding whether exceptional circumstances are present in a particular case and reviews the court's decision to depart downwardly for an abuse of its discretion.  *United States v. Galante*, 111 F.3d 1029, 1034-1036 (2d Cir. 1997).  The court's discretion should be "exercised prudently" with regard to the Guidelines' aim to reduce sentencing disparity, the defendant's history and characteristics, and the case law.  Id. at 1036.

The facts of this case fall far outside the scope of the few cases where the Second Circuit has affirmed family-circumstances departures.  *See United States v. Johnson*, 964 F.2d 124, 128-30 (2d Cir. 1992) (departure granted where defendant solely responsible for raising four young children, including an infant); *United States v. Alba*, 933 F.2d 1117, 1122 (2d Cir. 1991) (departure granted where defendant worked two jobs to support wife and two children, grandmother and disabled grandfather who depended on defendant's physical strength "to help him get in and out of his wheelchair."); *see also United States v. Galante* , 111 F.3d 1029, 1035 (2d Cir. 1997) (upholding departure based

upon (a) the defendant's primary role in upbringing of two young children, given wife's limited language skills and lack of ability to earn sufficient money to support the family, and (b) commitments to both the defendant' mother, who had little income, and his father, who was critically ill and might require his assistance in the future).[7]

Beyond such cases where the defendant has a unique and irreplaceably vital role in the caretaking of other minor or disabled family members, the Second Circuit has reversed downward departures, even under a deferential, abuse-of-discretion standard of review.  More recently, in *United States v. Smith*, 331 F.3d 292 (2d Cir. 2003), the Court reversed a family-circumstances departure for a defendant  who "had a close relationship with his two-year-old son and played a major role in caring for him, including dropping him off at day care, feeding him dinner, bathing him, and putting him to bed," and where the defendant's incarceration would result in his wife having to discontinue her college studies.  *Id.* at 293.  The Court observed that the defendant was "not the sole caregiver or financial supporter of his [2-year-old] son" and that the concerns for the son "may be alleviated by the availability of Smith's mother and half-sister for child care."  *Id.* at 294.  To the extent that the defendant's college studies would be disrupted, the Court noted that "[i]t is not unusual, however, for a convicted

---

[7] The facts of *Galante* barely sufficed under abuse-of-discretion review.  *See Galante*, 111 F. 3d at 1037-39 (Kearse, J., dissenting). In denying the government's petition for *en banc* review, the full Court made clear that the panel's majority decision was "limited to its precise facts and not an invitation to district judges to depart downward in the absence of truly exceptional family circumstances." *United States v. Galante*, 128 F.3d 788 (2d Cir. 1997)(*en banc*)(*per curiam*); *see also United States v. Faria*, 161 F.3d 761, 762 (2d Cir. 1998) (citing *en banc* court's limitation of *Galante* to its unique facts).

defendant's incarceration to cause some hardship in the family." *Id.*

      Similarly, in *United States v. Madrigal*, 331 F.3d 258, 260 (2d Cir. 2003), the Court reversed a family-circumstances departure that was premised on a female defendant's relationship with her six children. Focusing again on the availability of alternative caregivers, the Court observed the absence of evidence that the defendant was "the only person capable of providing adequate care for the youngest children" and that "[t]here was also evidence that the family as a whole remained cohesive, that [the defendant's] three older children were doing well and were available to care for their younger siblings, and that [the defendant's] extended family was also available for caregiving." *Id.* at 260. Accordingly, the Second Circuit concluded that "[u]nfortunate as the circumstances described by the court are, they are not 'extraordinary,'" and that "[t]hey are the common collateral damage of imprisonment and are far enough removed from those circumstances that existing case law has found exceptional that we must conclude that the district court acted outside of permissible limits in granting the downward departure for family circumstances." *Id.*

      In several other cases, the Second Circuit has reversed downward departures where, as here, the facts were far from exceptional. *See United States v. Carrasco*, 313 F.3d 750, 756-57 (2d Cir. 2002) (reversing family-circumstance departure for defendant who had three children and an ill father for whom he should provide financial support; "being the father of three children is in no sense an exceptional circumstance" and financial support for the father was not unique because "in view of the 'considerable

personal success' achieved by Carrasco's siblings"); *United States v. Faria*, 161 F.3d 761,

762-63 (2d Cir. 1998) (reversing family-circumstance departure for defendant who

provided financial support to wife and three minor children; "although Faria pays child

support, he no longer lives with his children, and his ex-wife earns approximately

$40,000 per year," such that "we cannot conclude that Faria's family is uniquely

dependent on the support it currently receives from him"); *United States v. Tejeda*, 146

F.3d at 87-88 (reversing family-circumstances departure for defendant with wife and

two children; "the existence of a stable family (a wife and two children)--something that

is by no means extraordinary-- does not satisfy the 'exceptional hardship' criterion

established by our precedents"); *United States v. Javino*, 960 F.2d 1137, 1146 (2d Cir.)(fact

that defendant's wife was pregnant with twins was not an extraordinary circumstance

warranting a downward departure), *cert. denied*, 506 U.S. 979 (1992).

Here, there are simply no facts equivalent to those that have been found to justify

a downward departure based on extraordinary family circumstances.  While the loss of

a child is no doubt tragic, there is no evidence that the defendant's family has been

unable to cope with their loss in the absence of the defendant.  While his family has

suffered financial stress in that they have been evicted from their apartment and his

wife's employment as a real estate broker has not been as lucrative as she had hoped,

the defendant's family has been living with other family members, his wife remains

employed and his children are all enrolled in the West Hartford public schools, long

known as one of the state's premier public school systems.  There is no evidence that the

22

defendant's family will not continue to receive assistance from family members while defendant is incarcerated. While the United States does not doubt the defendant's affection for his family, this hardly distinguishes him from most other defendants in the criminal justice system. While there will undoubtedly be some financial stress and disruption of the defendant's family structure by a sentence within the applicable guidelines range, this disruption is "inherent in the punishment of incarceration," *Johnson*, 964 F.2d at 128, and is not truly extraordinary or exceptional. Unlike the defendants in *Johnson* and *Galante*, there is no evidence that the defendant's family unit would be destroyed or that his children would suffer a disastrous effect were he imprisoned within the guideline range. None of the factors cited by defendant warrant the departure he seeks.

Similarly, defendant's identified community ties do not support a downward departure. A person's community ties are not ordinarily relevant in determining whether a sentence should be outside the applicable Guideline range. They are relevant in only extraordinary cases. U.S.S.G. § 5H1.6; *United States v. O'Brien*, 950 F.2d 969, 970-71 (5th Cir.)(reversing downward departure based on defendant's longstanding ties to the community, association with charitable causes, and performance of music at benefit concerts), *cert. denied*, 506 U.S. 819 (1992). Here, defendant's volunteer activities, contributions to scholarships and support of a local soccer team are commendable but by no means extraordinary. Therefore, his community ties do not provide a valid basis for departure. *O'Brien*, 950 F.2d at 970-71.

The Court, in deciding whether to exercise it discretion by departing, should consider that the defendant had numerous opportunities over the past 15 years to contemplate the emotional and financial impact his engagement in criminal activity might have on his loved ones and the impact on his community.  He should have considered that potential impact when he engaged in conduct for which he was convicted of larceny in New York in 1991.  He should have considered the impact his incarceration might have on his family and community when he committed acts that resulted in a felony larceny conviction in Connecticut in 1994.  Likewise, he could have thought about the potential impact on his family before embarking on his scheme to create fictional deductions and child care credits in his clients' tax returns in 1996.  Or he could have thought of his family's needs before he absconded to Canada during the course of these proceedings and while on pre-trial release.  While defendant would like to pass the blame to others, he has been in detention solely as a result of his own conduct.  It is apparent that over the past 15 years, the defendant chose the potential benefits of his schemes over any potential detriment to him and his family.  After having taken that calculated risk, he should not now be heard to claim that the impact upon his family excuses him from having to pay the price of his misdeeds.

Since the defendant has not satisfied his burden that a departure based on family circumstances and community ties is warranted, the Court should decline to depart downward.

4.        **Criminal History Departure**

Defendant first argues that he is entitled to a downward departure because his criminal history allegedly over represents the seriousness of his criminal past. The United States disagrees. As a preliminary matter, the United States believes the Court has discretion to depart on the proffered ground, but urges the Court not to exercise its discretion. Section 4A1.3 of the Sentencing Guidelines expressly authorizes a district court to downwardly depart with respect to a defendant's criminal history category if "the defendant's criminal history was significantly less serious than that of most defendants in the same criminal history category." *Id.* However, under the circumstances presented here a downward departure would not be appropriate.

"The defendant's criminal history reflects an individual who is not new to the criminal justice system." PSR at ¶98. His criminal record dates back to 1983, only three years after he arrived in the United States. More importantly, his record involves similar criminal conduct to the offenses for which he now stands convicted.

The facts behind defendant's 1994 conviction for first degree larceny which arose out of his embezzlement of approximately $17,000.00 from Ohio National Insurance Company suggest the lengths to which this defendant will go to carry out his financial schemes. In August 1993, Ohio National contracted defendant individually as an insurance agent. Although defendant desired to have Triumph Financial Group designated as the agent, he did not supply Ohio National with the necessary information to contract with a corporate designee. Thereafter, in August and

September 1993, defendant submitted applications for 15 whole life insurance policies to Ohio National. The death benefit amounts on all the policies were less than $100,000 and, as a result, the policies were issued without any verifications or underwriting requirements. Of the 15 policies issued, 12 had initial premium checks that bounced. Two of the bounced checks were from Tri-Fin Group which appeared to be the same entity for which defendant initially sought a corporate contract from Ohio National. It was apparent that defendant was submitting his own company's bad checks to receive annualized commissions on phony policies. Subsequently, defendant submitted another ten applications, for which several initial premium checks also bounced.

Based on the large number of bad checks, Ohio National began an internal investigation. Ohio National found many discrepancies and misrepresentations in defendant's application and personal history, including two different home addresses, non-existent personal references, false claims of being registered with NASD to sell securities and false claims of having participated in certain insurance classes. Many of the policies issued listed a Kamau Cush as the soliciting agent but did not contain his signature as required by law.

After Ohio National sent defendant a termination notice, he contacted the company to discuss the problems that had surfaced. He claimed that Mr. Cush was one of his agents. However, Ohio National had never received a licensing application for Mr. Cush and it also discovered that Mr. Cush's Connecticut and New York insurance licences had expired. Defendant also explained that checks had bounced because bank

accounts against which the checks were issued had been changed due to reorganization of the companies involved.  However, the investigation revealed that these accounts may never have existed at all.

Ohio National also attempted to contact several of the purported policy holders but was unable to find telephone listings for almost all of them.  Some of the corporate entities for whom applications were submitted listed an address that was identical to the residential address defendant listed in license application to the State of Connecticut.  Only one of the companies for whom an application was submitted had an address in the phone book or in town records.  Similarly, there was virtually no trace of supposed individual policy holders.  Only one individual applicant appeared to exist.  Her application listed Mr. Cush as the soliciting agent, she had paid Mr. Cush $30 and agreed to pay him the same amount every month to receive a ten (10) year contract with an undisclosed death benefit.  While she had never heard of the defendant, his signature as a witness is on her application.  Finally, Ohio National learned that defendant had left a large indebtedness of $180,000 to Indianapolis Life Insurance Company for commissions advanced to him.  Ultimately, defendant received approximately $17,000 in commissions from Ohio National as a result of these fictional transactions.

Defendant's scheme with Ohio National came on the heels of separate convictions in New Jersey and New York within the preceding three years that involved a credit application using false birth dates and social security numbers and the

issuance of bad checks respectively.  The serial nature of these three convictions all within a three year period certainly justify the three criminal history points required by the guidelines and set forth in the PSR.[8]  Indeed, given the nature of these crimes and, in particular, the facts of the Ohio National matter, it was a hardly a big leap for the defendant to create fictitious dependents, child care expenses and deductions on tax returns he prepared.  This scheme that resulted in convictions in this Court began while defendant was on probation for first degree larceny, justifying the imposition of another 2 criminal history points under §4A1.1(d).[9]  Obviously, defendant learned nothing from his prosecution in the Ohio National matter, and it is quite clear that the history of probation imposed upon him for his past crimes has not had a deterrent effect upon him.  In short, Criminal History Category III appropriately reflects his pattern of criminal conduct.

---

[8] The United States notes that in December 2003 defendant was charged by the State of Connecticut with four counts of forgery, twelve counts of larceny and four counts of issuing bad checks arising out of allegations that he defrauded at least ten clients out of their tax refunds for the 2001-2002 reporting period.  Defendant allegedly diverted at least $20,000 in proceeds by forging clients' signatures on refund checks and converting the proceeds to his personal use.  These charges were pending during the instant prosecution.  On September 28, 2004, following the jury's verdict in this matter, the State nolled the charges.  While these charges did not result in a conviction, there was at least probable cause to believe that defendant had hatched yet another scheme.

[9] There is no evidence to support defendant's claim that this probation terminated in April 1996.

**VI.**    **Conclusion**

For the reasons set forth above, defendant's motions for downward departure should be denied, the United States' request for a 2 level upward departure should be granted and the United States respectfully requests that the Court sentence the defendant within the offense level 18/Criminal History Category III guideline range of 33-41 months.


                              Respectfully submitted,
                              KEVIN J. O'CONNOR
                              UNITED STATES ATTORNEY



                              S. DAVE VATTI
                              ASSISTANT UNITED STATES ATTORNEY
                              450 MAIN STREET, ROOM 328
                              HARTFORD, CT  06103
                              (860) 947-1101
                              FEDERAL BAR NO. ct11957

                              DAVID A. RING
                              ASSISTANT UNITED STATES ATTORNEY

## CERTIFICATION

This is to certify that a true copy of the foregoing has been sent via United States mail, first class, postage pre-paid on the 30th day of November 2004 to:

Mr. Patrick A. Triumph
Reg. No. 14622-014
State ID 313641
Corrigan-Radgowski Correctional Center
986 Norwich-New London Turnpike
Uncasville, CT 06382

Norman A. Pattis, Esq.
Williams & Pattis
59 Elm Street
New Haven, CT 06510

_____

_____
S. Dave Vatti
Assistant United States Attorney