crimes he will commit the lesser, that the evil consequences --- of the crime will be minimized even if the crime is committed, that the least amount possible of punishment be used for the prevention of a given crime. See The Rationale of Legal Punishment, supra, at 23. Obviously, one problem with utilizing a system based only upon this approach is that "it is difficult --- to determine when more good than harm has been achieved ...." United States v. Concepcion, 795 F. Supp. 1262, 1272 (E.D.N.Y. 1992)

* As in the case of Kantian just deserts, the felicity calculation is subject to considerable difficulty and dispute. Another major problem with the utilit utilitarian approach is that the individual criminal can be treated very cruelly, to gain some societal advantage even though the crime is minor — or very leniently, despite the shocking nature of the crime — if that will on balance benefit society.

Given these problems, it may make sense to continue to equivocate, oscillating between these poles, tempering justice with mercy, just deserts with utility calculations, in varying pragmatic ways. "Pragmatism", one of the hallmarks of the American political and legal system, itself suggests a leaning toward utilitarianism. See Webster's New Twentieth Century Dictionary (William Collins ed. 2d ed. 1979) ("In philosophy [pragmatism] --- tests the validity of all concepts by their practical

-6-

RESULTS").

## Utility and Retribution Under Sentencing Guidelines

The Sentencing Guidelines, written by the United States Sentencing Commission pursuant to the Sentencing Reform Act, see Pub. L. 98-473, Section 217, 98 Stat. 1987, 2019 (1984), purport to comport with the competing theoretical ways of thinking about punishment. The Guidelines state that they provided "for the development of guidelines that will further the basic purposes of criminal punishment: deterrence, incapacitation, just punishment, and rehabilitation." See U.S.S.G. Chap 1, Pt. A(2). A systematic, theoretical approach to these four purposes was not, however, employed by the Commission.

A philosophical problem arose when the Commission attempted to reconcile the differing perceptions of the purposes of criminal punishment. Most observers of the criminal law agree that the ultimate aim of the law itself, and of punishment in particular, is the control of crime. Beyond this point, however, the consensus seems to break down. Some argue that appropriate punishment should be derived primarily on the basis of the

-17-

principle of "just deserts." Under this principle, punishment should be scaled to the offender's culpability and the resulting harms. Others argue that punishment should be imposed primarily on the basis of practical "crime control" considerations. This theory calls for sentences that most effectively lessen the likelihood of future crime, either by deterring others or incapacitating the defendant.

U.S.S.C. Ch.1, Pt. A(3) (The Basic Approach). The Commission decided not to create a solely retributivist or utilitarian paradigm, or "accord one primacy over the other." U.S.S.G. Ch 1, Pt. A(3) (The Basic Approach); see also Dale G. Parent, What Did the United States Sentencing Commission Miss? 101 Yale L.J. 1773, 1778 (1992) ("The Commission, did not articulate the purposes that ought to govern future sentencing, and as a result, it could not structure its guidelines to achieve particular results").

It is claimed that, as a practical matter, this choice between the competing purposes of criminal punishment was unnecessary because in most sentencing decisions the application of either philosophy will produce the same

-19-

or similar result." Id. This premise is flawed. In practice, results may vary widely depending upon theory. A penalty imposed based upon pure utilitarian considerations would hardly ever be identical to one that was imposed in a pristine retributive system. While it cannot be said that one is always harsher than the other, seldom would their unrestrained application produce the same sentence. Cf. David Dolinko, Three Mistakes of Retributivism, 39 U.C.L.A. L. Rev. 1623, 1626 (under the retributive theory, "punishment involves the deliberate imposition of suffering on persons convicted of crime"). But see The Utility of Desert, supra at 454 ("while the underlying rationales of the two views may be irreconcilable, their practical applications, properly done, suggest similar distributions of liability and punishment").

### Deference to Sentencing Judge on Guidelines Critical Sentencing Issues.

Since the Sentencing Commission did not say how competing rationales should shape individual sentencing decisions, courts are left to make that judgement. _____ _____, _____ __ _____, 66 S.Cal. Rev. 413, 448-49 (1992) ("It is hard to reconcile section 3553(a) [dealing with the purposes of sentencing] of the Act and the Commission's application instructions in guideline section 1B1.3 [dealing with

-20-

determination of the applicable guideline range]"),

The Sentencing Commission eschewed analysis in creating the Guidelines. Utilized was a statistical compilation of prior sentences as a substitute for study and evaluation. Cf. Criminal Sentences, supra at 7 ("Our Congress and state legislatures have failed even to study and resolve the most basic of the questions affecting criminal penalties, the questions of justifications and purpose--- these problems as to the purposes of criminal sanctions are, or should be, at the bedrock of any rational structure of criminal justice.").

In writing the initial Guidelines, the Commission "sought to solve both the practical and the philosophical problems of developing a coherent sentencing system by taking an empirical approach that used as its starting point data estimating pre-guidelines sentencing practice." U.S.S.G. Ch 1, Pt A(3). It contended that this empirical approach --- helped resolve its philosophical dilemma. Those who adhere to a just deserts philosophy may concede that the lack of consensus might make it difficult to say exactly what punishment is deserved for a particular crime. Likewise, those who subscribe to a philosophy of crime control may acknowledge that the lack of sufficient data might make it difficult to determine exactly the punishment that

21

will best prevent that crime. Both groups might therefore recognize the wisdom of looking to those distinctions that judges and legislators have, in fact, made over the course of time. These established distinctions are ones that the community believes, or has found over time, to be important from either a just deserts or crime control perspective. U.S.S.G. ch. 1, Pt. A (3). The statistically based foundation has proven inadequate to administer individual criminal litigations except in "routine" cases which they may be a consensus."

Reaching a consensus is difficult. Although the drafters of the Guidelines deviated from Pre-Guidelines practices in some instances where they believed public policy dictated, for example in the creation of extraordinarily harsh penalties for drug offenses, id, the degree of severity does not appear to be fully supported by public sentiment see e.g. Linda Drazga Maxfield et al, Just Punishment: Public Perceptions and the Federal Sentencing Guidelines (Research Bulletin) 3 (U.S. Sentencing Commission 1997) (69.7% of over 1700 people surveyed believed that persons convicted of trafficking crack cocaine should be sentenced below the Sentencing Guideline Range) Current research supports the view that present federal sentencing practices, leaning towards lengthy periods of incarceration, are

-22-

perceived as unnecessary harsh. See, e.g. Julian V. Roberts, American Attitudes About Punishment: Myth and Reality, in Sentencing Reform in Overcrowded Times 250, 254 (Michael Tonry & Kathleen Hatlestad, ed. 1997) (study "results suggest that increased use of alternatives to incarceration can proceed without fear of widespread public opposition ---"). The Report of the National Criminal Justice Commission, The Real War on Crime 60-61 (Steven R. Donziger, ed. 1996) ("Most Americans prefer punishments outside of prison for many types of nonviolent offenders if they are available."). As the huge increase in costs to taxpayers of excessive sentences come to be appreciated, it can be expected that a rational public will be even less approving of an anti-crime program largely ignoring utilitarian amelioration.

The Sentencing Commission claimed that the Guidelines may prove acceptable --- to those who seek more modest, incremental improvements in the status quo, who believe the best is often the enemy of the good, and who recognize that the Guidelines are, as the [Sentencing Reform] Act contemplates, but the first step in an evolutionary process." U.S.S.G. Ch.1.Pt.A(3). Based on its continuing observation of the courts' action, revisions to the Guidelines were to occur. U.S.S.G. Ch.1.Pt.A(3). Based on its continuing

-23-

observation of the courts actions, revisions to the Guidelines were to occur. U.S.S.G. Ch 1 Pt. A(2) (The Statutory Mission). Since the inception of the Guidelines in 1984, however, little change or improvement has taken place.

Modification seems unlikely given the present self-fulfilling arrangement. That is, courts, constrained by the Guidelines, tend not to deviate from them. As a result, the bulk of sentences fall within the current delineated Guideline range. "Experiences" of the courts are, therefore, a forced Guidelines experience — falsely suggesting vindication of the original determinations of the Commissions.

Moreover, as indicated by recent rejection of attempts to reduce differences in Guideline penalties for selling crack as opposed to the other form of cocaine, current political views make difficult any moderation of the Guidelines by the Commission. See e.g., United States Sentencing Commission, Federal Sentencing Policy 192 (1995) (suggesting that the current use of 100 to 1 sentencing ratio for crack cocaine offenses as compared to powder cocaine crime is unfair) Federal Sentencing Guidelines, Amendment, Disapproval, Pub. L. No. 104-38, 109 Stat. 334, 334-35 (1995) (rejecting the Sentencing Commission's proposed changes for reduction

-24-

of the sentencing disparity between crack and powder cocaine offenses); see also Rod Morgan & Chris Clarkson, The Politics of Sentencing Reform 199, 211 (Sentencing Reform Act to be viewed in light of the "political context in which it was written").

Judges by and large, believe that the Guidelines are too rigid and harsh. Molly Treadway Johnson & Scott A. Gilbert, The U.S. Sentencing Guidelines: Results of the Federal Judicial Center's 1996 Survey 3 (Federal Judicial Center 1997) (Federal judges "strongly prefer a system in which judges are accorded more discretion than under the current guidelines"). To the extent that district judges have exercised discretion in the face of the Guidelines and imposed sentences based upon humane considerations they consider relevant, individualization places many defendants below the excessively high penalties dictated by the Guidelines regime. See e.g. United States v. Caba, 911 F. Supp. 630 (E.D.N.Y. 1996) (sentence based upon lower guideline range for food stamp fraud rather than money laundering, the ~~count~~ of conviction; former more accurately reflected defendant's actual wrongdoing) United States v. ~~Caba~~ Rose, 885 F. Supp. 62 (E.D.N.Y. 1995) (providing support to grandmother and second cousins warranted lower sentence than that

-25-

provided for under the Guidelines)); United States v. Libutti, 1994 WL 774647 (D.N.J. Dec 23, 1994) ("defendant's combination of physical and mental conditions" presented extraordinary situation calling for reduced penalty); United States v. Naylor, 735 F. Supp. 928 (D. Minn. 1990) (downward departure from Guidelines granted where defendant committed crime while being "purposefully exploited by a manipulative lover 15 years her senior"); see also United States Sentencing Commission, 1996 Sourcebook of Federal Sentencing Statistics 39 (1997) (substantial assistance and other downward departures granted in almost 30% of the cases in 1996).

A fully comprehensive sentencing system that provides an absolute balance between the various sentencing rationales while permitting sentencing judges the appropriate level of discretion is probably not attainable. Cf. A case against the Kantian Retributivist Theory, supra at 276 ("no system currently exists [that provides] a fully satisfactory theory that both justifies punishment and provides a basis for just sentencing"). The creation of a flawless system is not a realistic goal. Yet the states with sentencing guidelines have created systems that appear much more reasonable than the current federal structure. See Richard S. Frase, Sentencing Guidelines are "Alive and Well"

-26-

in the United States, in Sentencing Reform in Overcrowded Times (Michael Tonry & Kathleen Hatlestad eds., 1997) ("States guidelines ... tend to reflect a better balance than the federal guidelines on such key sentencing issues as the relative weight to be given to offense versus offender variables; the amount of remaining judicial discretion; the degree of sanction severity" and other factors); see also e.g. Ark. Code Ann Section 16-90-804 (judges may deviate from sentencing grid within a certain range without written jurisdiction), Minn. Stat. Section 244.09 ("Sentencing guidelines are advisory to the district court"), Wash. Rev. Code Section 9.94A.010 (guideline system "structures, but does not eliminate, discretionary decisions affecting sentencing"); see generally 6 Fed. Sent. Rep. 123-68 (Nov/Dec 1993) (collection of articles relating to state sentencing guidelines); David Boerner, The Role of the Legislature in Guidelines Sentencing in "The Other Washington," 28 Wake Forest L. Rev. 381 (1993) (discussing Washington State's Sentencing Guidelines); Dale G. Parent, What did the United States Sentencing Commission Miss? 101 Yale L.J. 1773 (1992) (comparing the Federal Sentencing Guidelines to those of Minnesota).

The foreign experience may also be instructive. See e.g., Andrew von Hirsch, Sentencing Reform in Sweden in Sentencing

-27-

Reform in Overcrowded Times 211, 213 (Sweden's modified just deserts program is "based upon statutory rules, principles, and presumptions rather than on numeric grids"); Andrew von Hirsch, Guiding Principles for Sentencing: The Proposed Swedish Law Crim. L. Rev. 746 (1987), excerpted in Principled Sentencing 292, 292 (Andrew von Hirsch and Andrew Ashworth ed. 1992) (development of Swedish system); see generally 7 Fed. Sent. Rep. 270-311 (1995) (compilation of articles relating to sentencing in European countries). It is claimed that Swedish "sentencers seem to be engaging more frequently in the kind of explicit reasoning the statute is designed to promote — that is, discussion of such issues as how great the offense's penal value is, what mitigating or aggravating factors (if any) are present, and whether the prior criminal record is sufficient to adjust the penalty ___" Sentencing Reform in Sweden, supra at 214. Overall the system is primarily based on a just deserts theory. It is unclear just how successful the new retribution-based Swedish laws have been or if they will last given reported changes in the political atmosphere. Id at 214-15. Much depends on length of prison terms and utilization of non-custodial sentences.

-28-

## Application to the Guidelines

Until broad-based transformation of the current complex Federal System takes place, Individual Judges have a duty under the statutes to consider all traditional purposes of sentencing when determining an appropriate penalty. "Such purpose-based analysis by Judges may be the best hope for bring justification to sentences imposed in the Federal Guideline System." Purposes at Sentencing, supra at 478; see also Wharton's Criminal Law, supra, at 19-20. ("It is for the Sentencing Judge to decide on a case by case basis which theory is to be accorded priority"); Wayne R. LaFave & Austin W. Scott Jr., Criminal Law sections, at 24-25 (1972) (because of conflicts in sentencing rationales, "the judges --- who must sentence the convicted defendant within the limits set forth in Legislation --- must determine priorities."); see generally Koon v. United States, 518 U.S. 81, 116 S. Ct. 2035, 135 L. Ed 2d 392 (1996) (Traditional discretion of Trial Court in sentencing).

## Heartland

The Guidelines established base offense level for criminal acts representing an assessment of the quantity of punishment required for the "average" crime of that sort. As a result, sentencing courts are each guideline as carving out a "heartland, a set of typical cases embodying the conduct that each guideline describes." U.S.S.G. ch 1 PT.A(4)(b).

-29-

what this means, the Supreme Court has explained, is that the "district judge now must imposed on a defendant a sentence falling within the range of the applicable Guideline, if the case is an ordinary case" <u>Koon v. United States</u>, 518 U.S. 81, 92, 116 S.Ct. 2035, 135 L.Ed. 2d 392 (1996) (emphasis added.

The Guideline while intended to ensure "a more honest, uniform, equitable, proportional, and therefore effective sentencing system," U.S.S.G. Ch 1 Pt. A(3), must not be interpreted as eliminating judicial sentencing system. See <u>Koon</u>, 518 US at 92, 116 S.Ct 2035 ("The Act did not eliminate all the district court's discretion ---"). The traditional task of imposing a just and fair sentence based upon an independent view integrating all philosophical, statutory, Guidelines and individual particulars of the case at hand remains the job of the <u>nsi prius</u> judge.

<u>Departures:</u>

Congress provided for judicial departure from the Sentencing Guideline whenever a "court finds that there exists an aggravating or mitigating circumstances of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guideline that should result in a sentence different from that described." 18 U.S.S. 3553(b); see also <u>Thomas W.</u>

-30-

Hutchinson, et al., Federal Sentencing Law and Practice 14 (1997) (given the language of 18 U.S.C Section 3553(b), "the decision would seem necessarily to be judicial" as to whether or where departure is appropriate under the Guidelines, and outside the purview of the Sentencing Commission).

In the same way that the Commission could not have foreseen every type of criminal case, it could not have foretold every potential ground justifying departure from the Guidelines. See Koon, 518 U.S. at 83, 116 S.Ct. 2035 ("Commission chose to prohibit consideration of only a few factors, and not otherwise to limit, as a categorical matter, the consideration which might bear upon the decision to depart."); see also U.S.S.G. section 5k2.0 ("Circumstances that may warrant departure from the guidelines pursuant to the provision cannot, by their very nature, be comprehensively listed and analysed in advanced."). Except perhaps for a limited few grounds that the Commission has expressly stated that should not be considered as reasons for departing, it "does not intend to limit the kind of factors, whether or not mentioned anywhere else in the guidelines, that could constitute grounds for departure in an unusual case." U.S.S.G. Ch 1. Pt.A (4)(b).

Court must fully consider in each case whether departure from the Guidelines

31

Sentencing Chart is appropriate.

Respectfully Submitted

Dated: Dec 3rd, 2004

Patrick A. Triumph.
Defendant, Pro Se.

—32—